**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

JANE DOE
c/o Secretary of State, Safe at Home
P.O. Box 1198
Sacramento, CA 95812
Plaintiff, In Propria Persona

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSÉ DIVISION**

| | |
|---|---|
| JANE DOE, an individual,<br><br>     Plaintiff,<br><br>   *v.*<br>THE BOARD OF TRUSTEES OF LELAND STANFORD JUNIOR UNIVERSITY, *a California corporation*;<br>STANFORD UNIVERSITY DEPARTMENT OF PUBLIC SAFETY, *as a local government entity*;<br>LAURA L. WILSON, *in her individual and official capacity as Chief of Police*;<br>JASON A. SMITH, *in his individual and official capacity as a police officer;*<br>JASON BARNES, *in his individual and official capacity as a police officer*;<br>JON HERNANDEZ, *in his individual and official capacity as Lieutenant at SDPS;*<br>LYDIA BRICE MORGAN-HERMAN, *in her individual and official capacity as Law Enforcement Records Technician, Santa Clara County Office of the Sheriff Records Division, Stanford Department of Public Safety;*<br>JOHN DOES 1-15, *in their individual capacities as police deputies in Stanford University Department of Public Safety*;<br>RICHARD HARDING SHAW, JUNIOR, *in his individual* and official capacity as the Dean of Undergraduate Admissions and Financial Aid;<br>MICHAEL DEVLIN, *in his individual and official capacity as the Associate Dean of Undergraduate Admissions and Financial Aid*;<br>JEN CASEBEER-BLUM, *in her individual and official capacity as the Assistant Dean of Admission for Marketing, Events, and Yield*;<br>DEBRA L. ZUMWAHLT, *in her individual and official capacity as Vice President and General Counsel*;<br>JOHN ROES 1-10, *in their individual and official capacities as subordinates of Defendant Zumwahlt;*<br>PARINAZ ZARTOSHTY, *in her individual and official capacity as the Assistant Vice Provost & Executive Director of Bechtel International Center;*<br>SHIRLEY J. EVERETT, *in her individual and official capacity as Senior Associate Vice Provost, Residential and Dining Enterprises;*<br>JAMES R. JACOBS, *in his individual and official capacity as Executive Director, Vaden Health Center & Associate Vice Provost, Student Affairs;*<br>     Defendants. | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | Case No.: 5:26-cv-03809-BLF<br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>**1. 42 U.S.C. § 1983 VIOLATION (Violation of the First Amendment of the United States Constitution—Right to Freely Petition the Government for Redress of Grievances without Retaliation)**<br>**2. 42 U.S.C. § 1983 VIOLATION (Violation of the First Amendment of the United States Constitution—Right to Speak Freely without Retaliation)**<br>**3. 42 U.S.C. § 1983 VIOLATION (Violation of the Fourteenth Amendment of the United States Constitution—Procedural Due Process)**<br>**4. 42 U.S.C. § 1983 VIOLATION (Violation of the Fourteenth Amendment of the United States Constitution—Substantive Due Process)**<br>**5. 42 U.S.C. § 1985 VIOLATION (Civil Conspiracy against Rights)**<br>**6. VIOLATION OF TOM BANE CIVIL RIGHTS ACT (California Civil Code, section 52.1)**<br>**7.VIOLATION OF UNRUH CIVIL RIGHTS ACT (California Civil Code, section 51)**<br>**8. INTRUSION UPON SECLUSION**<br>**9. DEFAMATION—LIBEL PER SE AND PER QUOD**<br>**10. BREACH OF CONTRACT**<br>**11.BREACH OF IMPLIED-IN-FACT CONTRACT**<br>**12.BREACH OF IMPLIED-IN-LAW CONTRACT/ *QUANTUM MERUIT***<br>**13.BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**14.INTENTIONAL AND TORTIOUS INTERFERENCE WITH EXISTING CONTRACT AND INDUCING BREACH OF CONTRACT THERETO**<br>**15.PROMISSORY ESTOPPEL**<br>**16.FRAUD (FRAUDULENT CONCEALMENT, MISPRESENTATION, NON-DISCLOSURE)**<br>**17.NEGLIGENCE**<br>**18.NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**19. *RESPONDEAT SUPERIOR* ON COMMON LAW CLAIMS**<br>**TRIAL BY JURY DEMANDED** |

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

**COMES NOW BEFORE THIS HONORABLE COURT** the Plaintiff and hereby alleges and complains as follows:

**<u>PARTIES</u>**

1. At all time relevant to this complaint, the Plaintiff was either an undergraduate student at Stanford, living as a *non-resident* alien in the counties of Santa Clara and San Francisco, CA, or was expelled therefrom and trying to have that decision be set aside at various places in Europe.[1] The Plaintiff intended to be a professor of constitutional law— with a particular interest in the establishment and development of common law courts under King Henry II, the development of courts of chancery after *Earl of Oxford's Case*, traditional cannons and maxims of statutory interpretation, conflict of laws (and particularly recent developments on the *Erie* doctrine, including *Gasperini*), and the judicial philosophy of the late Rehnquist Court (if any *coherent* judicial philosophy could be accorded to it)—but that life plan seems to have been altered *dramatically* ever since.

2. At all time relevant to this complaint, the defendant, THE BOARD OF TRUSTEES OF LELAND STANFORD JUNIOR UNIVERSITY, d/b/a Stanford University (hereinafter

_____

[1] Pertinently, the Complaint was *filed* when the Plaintiff was not in the U.S. and, thus, not a citizen of any state. It is well established that diversity of citizenship is established at the filing of the complaint, and post-filing developments cannot defeat jurisdiction if jurisdiction was proper at the time of filing nor create jurisdiction where it did not initially exist. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 569-70 (2004); *see also Dole Food Co. v. Patrickson,* 538 U.S. 468, 479, (2003). The California address that appears on the caption page is the Secretary of State's mail-forwarding service under the provisions of the Safe at Home Act. *See* California Government Code, sections 6205 through 6216. Even assuming, *arguendo*, that the Plaintiff was located in California when she filed the complaint, complete diversity would still exist. Although "the Ninth Circuit has [not] directly addressed the 2011 amendment's effect on the diversity jurisdiction issues raised here[]" *Guan v. Bi*, No. 13-cv-05537-WHO, 2014 U.S. Dist. LEXIS 29961, at \*13-14 (N.D. Cal. Mar. 6, 2014) yet, it is clear that the provisions of *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas*, S.A., 20 F.3d 987, 990-91 (9th Cir. 1994) would hold that suit between *non-resident* aliens (those who have not been granted permanent residence) and citizens and resident aliens (who are assumed to be citizens under the 2011 amendment) does not defeat complete diversity of citizenships. *See, e.g., Karazanos v. Madison Two Assoc.,* 147 F.3d 624, 628 (7th Cir. 1998); *Shovlin v. Careless*, No. C-12-1120 PJH, 2013 WL 3354544 at \*6 (N.D. Cal. June 26, 2013). Although the 2011 amendment was intended to avoid the so-called issue of 'suit between neighbors,' it only offered a limited remedy to that problem by only addressing *permanent* residents within its scope (and deeming them citizens for the purposes of diversity jurisdiction). As such, suits between non-resident aliens and citizens can invoke diversity jurisdiction.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT

"Stanford"), was and still is a trust with corporate powers established under the laws of the State of California and the governing board of the university that expelled the Plaintiff—it is alleged—in retaliation of filing of a civil complaint, in this Court on April 21, 2025. It is located, incorporated, and does business in County of Santa Clara, CA.[2]

3. At all times relevant to this complaint, the defendant STANFORD UNIVERSITY DEPARTMENT OF PUBLIC SAFETY ("SDPS") was the police force[3] of Stanford, who acquired its policing authority from a memorandum of understanding with the County of

---

[2] Defendant Stanford never disputed its citizenship of California for the purposes of establishing diversity jurisdiction under 28 U.S.C. § 1332 for at least the past 100 years of litigation. As such, the complicated question addressed, partially, in *Navarro Savings Assn. v. Lee* 446 U.S. 458 (1980) is dispensed with herein for the sustenance of judicial resources. If Stanford does dispute it, it should be estopped from doing so by judicial estoppel, unless its corporate structure changed from the last time it invoked diversity jurisdiction as a California 'citizen.' *See, inter alia, Nat'l Supply Co. v. Leland Stanford Junior Univ.*, 134 F.2d 689 (9th Cir. 1943) (invoking the Court's diversity jurisdiction to address a contract dispute it had with a Delaware corporation as a California 'citizen'). *See, e.g., Board of Trustees of Leland Stanford Junior University v. National Library of China*, case no. 4:19-cv-02904 (N.D. Cal 2019), at Dkt. No. 1, at ¶ 34. ["Stanford [*sic*] resides [*sic*] in California for purposes of diversity [jurisdiction] [.]"].

[3] Whether SDPS is a separate legal entity capable of being sued is a complicated question that the Plaintiff contends should be left to briefing—and it should be the defense counsel's burden to establish it to the contrary. *See, e.g. Loyd v. Paine Webber, Inc.*, 208 F.3d 755, 758 (9th Cir. 2000) ("A corporation is a distinct legal entity that can sue and be sued separately from its officers, directors, and shareholders."). "A request to **pierce the corporate veil** is only a means of imposing liability for an underlying cause of action and is not a cause of action in and of itself." *Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir.1999) (emphasis added); *see also In re Grothues*, 226 F.3d 334, 337-38 (5th Cir. 2000) (alter ego theory is a *remedy* to enforce a substantive right, not an *independent cause of action*). As such, the Plaintiff *need not* plead a separate cause of action to be able to invoke an alter ego theory (or any other kind of such corporate legal entity theory) in the future during briefing. *See, e.g., Maganallez v. Hilltop Lending Corp.,* 505 F. Supp. 2d 594, 607 (N.D. Cal. 2007) (citations omitted). ["alter ego determinations, however, are highly fact-based, and require considering the totality of the circumstances."]. It is difficult to see herein how the defendants would be able to argue that SDPS is *not not separate* from the County of Santa Clara Sheriff's Office, or the university, writ large. But, again, a complaint cannot, by itself, pierce the *clandestine* corporate veil—and certainly the heightened pleading standard set in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (*Iqbal*) has not changed that. If SDPS is not a separate entity from the Sheriff's office, then it is plainly the County or the State. If SDPS is not separate and distinct from the university…that is an odd claim to make for a multitude of reasons. Certainly, the university does not have the 'distinct' authority of being able to execute, *inter alia*, arrests.

3

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

Santa Clara[4] and its officers were acting under the deputization of Santa Clara Sheriff's Office pursuant to California Penal Code, Section 830.6. Defendant SDPS seems to have not previously disputed that it is a government actor, *see, e.g., Doe v. Smith, et al.*, No. 25-cv-03490-PCP (N.D. Cal. 2025)[5] (*Doe I*), and, as such, if it claims otherwise in this action, it should be judicially estopped from doing so.

4. At all times relevant to this complaint, the defendant LAURA L. WILSON was the Chief of Police. The Plaintiff is informed and believes and thereon alleges that she is the most senior officer of command at SDPS and that she individually participated in all of the civil wrongs perpetuated by SDPS officers.

5. At all times relevant to this complaint, defendant JASON A. SMITH was and is a police officer within SDPS.

_____

[4] The Plaintiff hereby incorporates by reference this Memorandum of Understanding. *See* https://perma.cc/Y8WF-8ZYB . *See also* https://perma.cc/LP8W-3V8G . Documents incorporated by reference may include documents that a complaint refers "'extensively to'" or that "'for[m] the basis of the plaintiff's claim,'" *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003), as well as documents that the complaint "necessarily relies" on, the authenticity and relevance of which are uncontested, *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). Here, the incorporation-by-reference standards are satisfied. Other government departments or entities can only be sued if they are intended to be separate and distinct legal entities. *See, e.g., Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995). As such, the suit against SDPS is *not* a *Monell* claim but a proper Section 1983 claim that need **not plead a policy or custom**. *See Monroe v. Pape,* 365 U.S. 167 (1961), partially overruled as stated in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See also City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989). It appears to be a **question of first impression** as to whether deputization under Penal Code, section 830.6 would support an alter ego or separate-entity theory. No court seems to have addressed this issue. *See, e.g., United States v. Mangi*, No. 18-cr-00260-EJD-1, 2022 U.S. Dist. LEXIS 96813, at \*14 (N.D. Cal. May 31, 2022) (merely *stating* that the SDPS' policing authority is driven from Penal code, section 830.6).

[5] Indeed, it also seems to not have claimed that its acting-under-the-color-of-law status is driven from the private-party-that-acted-under-the-color-of-law test but driven from its *plain* position as a government entity. *See Doe I*, at Dkt No. 24, No. 43, at pp. 23-27 (explaining that defendants have not argued that they are not government actors but invoked qualified immunity in an eclectic way nonetheless, expressing skepticism as to that claim under *Lugar, Wyatt, Richardson,* and *Filarsky* if defendants' concessions are to be taken to be satisfying the government-nexus test as opposed to plain government action), No. 57 (merely stating disagreement over the Plaintiff's claims about qualified immunity and the historical record of not affording qualified immunity to private parties acting the color of law since *Lugar*'s pertinent footnote). This footnote shall be considered the Plaintiff's request to take judicial notice over the *existence* of these three pleadings.

4

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

6. At all times relevant to this complaint, defendant JASON BARNES, was and is a police officer within SDPS.

7. At all times relevant to this complaint, defendant JON HERNANDEZ was a Lieutenant within SDPS. The Plaintiff is informed and believes and thereon alleges that HERNANDEZ is both BARNES and SMITH's superior officer and that he individually participated in all of the civil wrongs perpetuated by SDPS officers.

8. At all times relevant to this complaint, defendants JOHN DOES 1-15 are police deputies in SDSPS whose particulars and names are unknown to the Plaintiff at the time of the filing the Complaint. The Plaintiff is informed and believes and thereon alleges that all of the actions complained herein were perpetuated by DOES 1-15.

9. At all times relevant to this complaint, defendant RICHARD HARDING SHAW, JUNIOR was the Dean of Undergraduate Admissions and Financial Aid of Defendant STANFORD. The Plaintiff is informed and believes and thereon alleges that defendant SHAW was the supervisory officer of defendants DEVLIN and CASEBEER-BLUM and individually participated in all of the civil wrongs perpetuated by DEVLIN and CASEBEER-BLUM.

10. At all times relevant to this complaint defendant MICHAEL DEVLIN was the Associate Dean of Undergraduate Admissions and Financial Aid.

11. At all times relevant to this complaint, defendant JEN CASEBEER-BLUM was the Assistant Dean of Admission for Marketing, Events, and Yield.

12. At all time relevant to this complaint, defendant DEBRA L. ZUMWAHLT was the Vice President and General Counsel. The Plaintiff is informed and believes and thereon alleges that defendant ZUMWAHLT was the supervisory officer of defendants ROES 1-10 and individually participated in all of the civil wrongs perpetuated by ROES 1-10.

13. At all times relevant to this complaint, defendants JOHN ROES 1-10 were officials within the Office of General Counsel whose particulars and names are unknown to the Plaintiff at the time of the filing the Complaint. The Plaintiff is informed and believes and thereon alleges that all of the actions complained herein were perpetuated individually by ROES 1-10.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT

14. At all times relevant to this complaint, defendant PARINAZ ZARTOSHTY was the Assistant Vice Provost & Executive Director of Bechtel International Center. The Plaintiff is informed and believes and thereon alleges that defendant ZARTOSHTY was in possession of the Plaintiff's Student and Exchange Visitor Program Record.

15. At all times relevant to this complaint, defendant SHIRLEY J. EVERETT was the Senior Associate Vice Provost, Residential and Dining Enterprises. The Plaintiff is informed and believes and thereon alleges that defendant EVERETT was the contracting party in the Plaintiff's housing contract with defendant STANFORD.

16. At all times relevant to this complaint, defendant JAMES R. JACOBS was the Executive Director of Vaden Health Center and the Associate Vice Provost of Student Affairs. The Plaintiff is informed and believes and thereon alleges defendant JACOBS is generally responsible for administering defendant STANFORD's mental health services for students.

17. Non-party William Marsh Rice University ("Rice") an educational institution and private university that defendants herein allege, with no material and proper evidence, the Plaintiff attended.

18. Non-party JUSTIN SCHILKE ("Schilke") is the Deputy Registrar at Rice and is responsible for overseeing daily Office of the Registrar operations such as handling Federal Education Rights and Privacy Act (FERPA) Requests

## JURISDICTION

17. This Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction). For any state law claims, this court retains jurisdiction over this action under its diversity jurisdiction driven from 28 U.S.C. § 1332 as there is complete diversity of citizenships between all the defendants the Plaintiff. Even if the Court did not have diversity jurisdiction over the state-law claims (it does), it would have supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law violation allegations involve the same nuclei of events as the federal law claims.

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

18. Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims herein occurred in this judicial district.

19. As per Civil Local Rule 3-2 (e), the San José Division is the appropriate division to bring this claim because this "civil action[] […] arise[s]" from conduct occurred "in the count[y] of Santa Clara[.]" *Ibid*. *See also* Civil Local Rule 3-5 (b).

## FACTS

The Plaintiff's Earlier Encounters with Defendants Smith, Barnes, and Hernandez and Other SDPS Officers

20. Although not necessarily relevant to the causes of action[6] alleged in this suit, the Plaintiff still finds it useful to provide some background into the Plaintiff's first interaction with Defendants Smith, Barnes, and Hernandez and other SDPS officers for the Court to better understand the context from which these allegations arise. The Plaintiff also finds that it is important for such allegations to be included in the Public Record so that a record could be created so that posterity could see how the defendants went wrong[7] herein, especially when there will come a time in the future—long after the Plaintiff's time in this world—when the defendants' *Dred Scott-esque* treatment of the

---

[6] The Plaintiff takes no position in this pleading whether any future action that could be filed on Defendants Smith, Barnes, and Hernandez' above-complained-of conduct would be barred by *res judicata* given the dismissal with prejudice in *Doe I*. The Plaintiff also takes no position if a *collateral attack* by way of filing a new complaint alleging the same allegations as *Doe I* and arguing that the stipulation therein was unconscionable (and, thus, void *ab initio*) would be barred by *res judicata* or other principles of claim preclusion. The Plaintiff also takes no position as to whether the Plaintiff's *direct attack* on that stipulation by way of filing a Rule 60(b) was erroneously denied by the court in *Doe I* and dispenses this Court with arguing the merits of the Plaintiff's appeal on that Order to the Ninth Circuit, which will be posing multiple questions of substantive and procedural law of first impression in this Circuit (as the Court in *Doe I* recognized *sub silentio*).

[7] Loosely paraphrasing *Trump v. J.G.G.*, 604 U.S. 670, 692 (2025) (Jackson, J., dissenting). ["At least when the Court went off base in the past, it left a record so posterity could see how it went wrong."]

7

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

Plaintiff (and those like the Plaintiff) would warrant a certain, almost-universal moral opprobrium that *Dred Scott*[8] <u>now</u> does for almost all (reasonable) Americans.

21. The Plaintiff's first encounter with Defendants Smith, Barnes, Hernandez was when the Plaintiff had contacted SDPS about ████████████████████ ████████████████████

22. The said encounter with SDPS took place ████████████ ████████████████████ ████████████████████ ███████████████████"

23. The Plaintiff was perturbed by this speech.

24. She brought it t████████████████ ████████████████

25. Still disturbe████████████████ ████████████████████ ████████████

26. ████████████████████ the Plaintiff had contacted SDPS, where Defendants Smith and Barnes arrived at the Plaintiff's dormitory room to speak with the Plaintiff about the encounter.

27. Although the Plaintiff would like to dispense this Court with a lengthy recitation of events, given Federal Rules of Civil Procedure 8 (a) (1)████████ ████████████████████ ████████████████████ ██████

28. ████████████████████ ████████████████████, ████████████ ████████████████

---

[8] *See Dred Scott v. Sandford* 60 U.S. (19 How.) 393 (1857) (finding that Black Americans are not 'people' and, therefore, cannot have standing to appear before our federal courts.).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

29. During this encounter, when Smith was in the Plaintiff's dormitory and referring to her as a "he" and a "sir," the Plaintiff corrected Defendant Smith and asked that she be referred to as a "she" or a "ma'am" (or simply refer to her by her name).

30. Defendant Smith said something to the proximate effect of, "well I will not do not that. I do not believe in that sort of stuff."

31. Defendant Smith then pointed his fingers at the Plaintiff's then-developing breasts (and brassiere, and said something to the proximate effect of, "just because you pumped yourself in synthetic hormones will never make you a woman."

32. Perturbed by Defendant Smith's speech, Plaintiff asked Defendant Smith that he either leaves the Plaintiff's room or that he turns his body camera on (which was turned off at the time) or that the Plaintiff opened her dorm room's door so that there could be witnesses to the way he interacted with the Plaintiff.

33. Defendant Smith said something to the proximate effect of, "okay, I'll leave you and your *thing* alone." (italics added for emphasis).

34. Although the Plaintiff was—and still is—unsure what the 'thing' the Defendant Smith mentioned was, she presumed and presumes that it was a vulgar metaphor for the Plaintiff's imagined genitalia and its particulars and its assumed-by-Defendant-Smith morphology thereof—where the morphology seems to be assumed to be a phallus.[9]

35. The Plaintiff then had a conversation with Defendant Barnes, who indicated that SDPS would not be taking any action, ███████████████████████████ ███████████████████████████

---

[9] These allegations were not included in *Doe I* because they were generally unrelated to the allegedly unconstitutional conduct therein. And they are largely irrelevant herein, too. But the Plaintiff would be remiss if she did not note these now so that the Court can observe for herself the extent of the defendants' mental abuse of the Plaintiff over the course of two years. The Plaintiff was apprehensive about including these allegations given the defendants' *vigorous* opposition to the Plaintiff proceeding pseudonymously herein and was apprehensive that she would be marked as a trans person in the Public Record for *eons*, and the Plaintiff is of the belief that she can establish a claim for discrimination as a member of a class of 'one' under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), but given defense counsel's conduct in *Doe I*, she is of the belief that it is absolutely necessary for these facts to be included herein. The Plaintiff also moves this Court for judicial notice of the existence of Docket Number 162 in *Doe I* and wishes to incorporate that pleading as if fully set herein. The Plaintiff notes that the Court in *Doe I* granted Plaintiff leave to proceed pseudonymously on May 10, 2026, the day this complaint is being filed.

9

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

36██████████████████████████████████████████████
████████, Defendants Barnes and Smith said something along the lines of, "sure, if you are that stupid then do it."

37██████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

38.The Plaintiff indicated on the *ex parte* application the phrase that was included *ante* at ¶ 22.

39██████████████████████████████████████████████
████████████████████████████████ A true and correct copy of ████████████████████████ is filed with this Complaint as Exhibit A and is incorporated into the complaint as if fully set herein.

40.██████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████ the Plaintiff again was informed by the Sheriff's Office to contact SDPS for SDPS ██████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████

41.The Plaintiff, during the second encounter, had to interact with Defendant Smith, who refused to serve the order on th██████████████alling it "stupid" and a "waste of [his] time."

42.When the Plaintiff requested to speak with Defendant Smith's supervisory officer, she was told that that person would be Lieutenant Hernandez (who is the here-Defendant Hernandez).

43.Defendant Hernandez said something along the lines of, "I will not serve this order today, sir, I think it's stupid and I don't think you should be allowed to do this."

44.██████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████efendant Hernandez

10

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

responded along the lines of "I don't care; why do *your people* always make a scene out of small things[.]" (italics added).

45. It is unclear to the Plaintiff what "your people" meant in this context.

46. When the Plaintiff informed Defendant Hernandez that ███████████████ ████████████████████████████████████ ██████ Defendant Hernandez, after three or so hours, finally served on the restrained person and removed her from the same dormitory as the Plaintiff.

47. It is unclear to the Plaintiff why defendants herein so vigorously opposed the Plaintiff's then-petition to the government for redress of grievances, █████████████████ ████████████████████████████████ █████████████████████████ it makes sense that the defendants herein would be opposed to that petition.

48. It is equally unclear, for instance, █████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ █████████████████

49. Before the hearing for the issuance o███████████████████████ the Plaintiff wanted to acquire a copy of the police report that was filed on that case to see if it might aide her case.

50. The Plaintiff sent a request for a copy of the police report in this case where she was a victim o███████████

51. A true and correct copy of that Request is being lodged with this Court as Exhibit B.[11]

52. The Plaintiff sent that request to police-records@lists.stanford.edu on or about February 25, 2024.

---

██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████
████████████████████████████████████
███████████████

[11] *See also* ECF No. 12-2.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

53. As instructed, the Plaintiff attached a copy of her ID card to that request.

54. The ID card photo appended to that request was taken on my desk (as can be seen from the background).

55. Someone named Lydia Brice Morgan-Herman from the email address lherman@stanford.edu confirmed receipt of it.

56. Defendant Morgan-Herman, a week or so later, emailed the Plaintiff to indicate that the report was ready and that the Plaintiff can obtain it from the precinct.

57. The Plaintiff did so.

58. The police report obtained by the Plaintiff generally confirms the Plaintiff's allegations to this Court by ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████

59. ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████

60. It is unclear to the Plaintiff how such a claim is cognizable since th████████████ therein concedes and admits to saying the phrase in question.

61. Rather, the ███████████ therein seems to maintain that because of the speech's *tone*, it would not constitute ███████████████████████ ████████████████████████ party's *dissatisfaction* with the judicial determination by the judicial officer that signed ███████████████████

───────────

[12] No party during the proceeding in the state court argued that the said speech was protected conduct that cannot be enjoined by the State of California. And it appears to the Plaintiff that that would be a meritless argument as the said phrase appears to the undersigned to *precisely* be an example of fighting words. *See, inter alia, Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). The undersigned is unaware if the 'tone' of speech has ever been a relevant inquiry while conducting a First Amendment protected speech analysis (or, for that matter, a civil harassment analysis). Indeed, it appears that the purportedly 'palatable' tone of the speech that is subject to First Amendment analysis is decidedly irrelevant to a First Amendment claim. *See, inter alia, Snyder v. Phelps*, 562 U.S. 443 (2011) (holding that speech that contains reprehensible content delivered in a tone and manner many would find objectionable is protected speech). The conduct in question in *Synder* was holding a sign that read "God Hates Fags [*sic*]" in the funeral of a member of the Armed Forces who passed away during active duty. This is a complicated discussion (time and manner restrictions on protected speech and their constitutionality thereof), and it is irrelevant to *this* complaint. █████████████████████████████████u████████████s ███████████████████████████████

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

62. The Plaintiff brought suit in the same Superior Court for, *inter alia*, ███████████

███████████

The Initial Purported Police Investigation by Defendant Smith because of the Plaintiff's Protected Speech, her Right to Access Courts as an Extension of Her Right to Petition, and because the Plaintiff 'sounded female' on the phone while being an alleged and purported 'biological male,'[13] and her detainment and Defendant Smith's Assault thereto, and the Filing of *Doe I*

63. On April 20, 2025, the Plaintiff got a cryptic call in the morning by Defendant Smith indicating that the Plaintiff had to make herself present in the Stanford University Department of Public Safety precinct, for what defendant Smith termed to be "questioning" on his "investigation into a possible crime."

64. Defendant Smith mandated the Plaintiff to come to the police station by 4 PM of that Sunday.

65. When the Plaintiff went in for the purported and mandated questioning. Defendant Smith placed the Plaintiff into what the Plaintiff cognized at the time to be a locked room, where he walked toward the Plaintiff, stood incredibly close to the Plaintiff, made various hand gestures, moved his body to and fro, and at some point, marched his body toward the Plaintiff and then pulled his body back.

66. Defendant Smith also said something along the lines of, "oh, well, long time no see since last year" when the Plaintiff initially made herself present under the threat of Defendant Smith's use of his authority.

67. At no point during this interaction did the Plaintiff know that she was free to leave or that the precinct door which Defendant Smith contended was locked was not locked (both from the inside and outside).

---

[13] It is utterly unclear to the Plaintiff, in utter honesty, how Defendant Smith determined that the Plaintiff is a "biological male." The undersigned's *amicus* who has two PhDs in biology recognizes that there is no academic consensus as to what constitutes one as a "biological male." Has Defendant Smith taken a blood sample from the Plaintiff and analyzed it for her chromosomal structure? Or has Defendant Smith launched himself into the Plaintiff's, *well*, pants and determined the so-called 'biological maleness' as such? It is unclear how Defendant Smith could know that the Plaintiff is a "biological male" without *sub silentio* admitting to assaulting the Plaintiff. *See also ante* at p. 8, n.9 (incorporating by reference a pleading wherein the Plaintiff explains the inappropriateness of referring to the Plaintiff in such term during a judicial proceeding and collecting authority thereto, citing, *inter alia*, *Hecox*, where counsel is admonished by those courts to not use such inflammatory language).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

68. And after Defendant Smith's phone conversation, the Plaintiff was not aware that the Plaintiff had the choice to not go to the police station. Defendant Smith had told the Plaintiff that he had been to the Plaintiff's dorm room, and the Plaintiff was scared that Defendant Smith would come again and enter the dorm room without the Plaintiff's permission, a warrant, or any kind probable cause (because it was a Sunday when he called the Plaintiff, the Plaintiff was staying with her then-boyfriend in San Francisco).

69. The Plaintiff was particularly apprehensive to talk to Defendant Smith in person because when the Plaintiff interacted with him a year or so ago (as enumerated supra), he had made the Plaintiff very uncomfortable because of his commentary on the Plaintiff's genitalia.

70. Defendant Smith was also one of the few people at Stanford who would consistently misgender the Plaintiff despite repeated request from the Plaintiff that he calls the Plaintiff a 'she' and not a 'he,' so the Plaintiff always felt like he was intentionally mistreating the Plaintiff because the Plaintiff is transgender.

71. Defendant Smith's purported investigation into a purported crime was due to an email the Plaintiff sent and a call the Plaintiff made to the Clerk of the Court in a state action where the here-Plaintiff was also the Plaintiff therein, asking that the Clerk cancels the filing of the pleading because it was intentionally revealing my personal information in a case where the Plaintiff was granted pseudonymous status.

72. At no point during the Plaintiff's interactions with the Clerk, however, did the Plaintiff indicate that the Plaintiff was the actual party that filed the pleading but indicated to the Clerk that the Plaintiff was *a* litigant in the proceeding and, specifically, the Plaintiff in that proceeding (the pleading was filed by the there-defendant).

73. The Clerk cancelled the pleading at the Plaintiff's instruction twice or thrice or so.

74. After this interaction with Defendant Smith, on April 21, 2025, the Plaintiff filed a Section 1983 action in this district court (supplemented with state-law claims), alleging multiple constitutional violations. *See Doe I, supra*.

75. That complaint was prepared late at night on April 20, 2025.

76. The Plaintiff filed the said complaint in this district court in person a day after.

14

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

77. But when the Complaint was ready late at night on April 20, 2025, the Plaintiff emailed a copy of that complaint to Defendant Smith, Defendant Wilson, and defendant Wilson's supervisory officer at the Board of the Trustees of Leland Stanford Junior University whose name she cannot recall right now.

78. Put differently, although service of the complaint seems to have been effectuated on Defendant Smith on April 26, 2025, Defendant Smith was aware of the allegations of the complaint from late night April 20 (or early morning of April 21). Defendant Smith seems to have written his initial report on April 22, 2025, and it appears to the Plaintiff that the said report might have been written after Defendant Smith was provided legal counsel that his misgendering of the plaintiff could be considered a *per se* showing of intent to discriminate.[14]

79. The Plaintiff brings this up because Defendant Smith's misgendering of the Plaintiff was brought up in the initial complaint in *Doe I* and the police report Defendant Smith drafted is the *first time* ever where Defendant Smith does not refer to the Plaintiff as a "he."

80. During a Federal Rules of Civil Procedure, Rule 60(b) motion in this district court on that action, the Plaintiff was provided with a copy of the police report Defendants Smith and Barnes filed, approved for filing by Defendant Hernandez.

81. A true and correct copy of this police report is lodged with this Court as Exhibit C.

82. It appears that other than some vague conspiratorial thinking stemming from Defendant Smith's inability to understand how the rule of law and courts function in this nation for instance (one might query how Defendant Smith can 'enforce' about what he has no idea…the most basic *scintilla* of an idea), thinking that the parties' "share civil case

---

[14] In the Ninth Circuit, the use of discriminatory language is taken as *per se* intent to discriminate. *See McGinest v. GTE Service Corp*. 360 F.3d 1103, 1115 (9th Cir. 2004). Further, in this Circuit, district courts are bound by *McGinest* to asses allegedly discriminatory conduct from the viewpoint of a reasonable member of the discriminated-against minority group. As such, there is no use of language to a reasonable transgender person that is more offensive than being misgendered. Indeed, as was the case in *McGinest*, such uses of language carry the same injurious power as using the N-word to refer to a Black American. As such, misgendering a trans person satisfies that test for *per se* discriminatory animus. *See Prescott v. Rady Children's Hospital San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (SD Cal. 2017) (finding as such) ; *see* also *Stevens v. Martinez*, 2025 U.S. Dist. LEXIS 113183 (E.D. Cal. June 13, 2025) (same). *See also Tay v. Dennison* 457 F. Supp. 3d 657, 683 (S.D.Ill. 2020) (same).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

number" is so "unique and specific to their court proceedings" that it "is unreasonable to believe that other individuals, not involved in the case, would have this information" Exhibit C, at p. 7.

83. Of course, Defendant Smith's unwashed illiteracy and unlearnedness can be deconstructed by a simple legal concept this nation has had since even before our foundation: The openness of judicial proceedings to the public and their availability in the Public Record, driven both from our First Amendment jurisprudence and the common law right to observing judicial proceedings.

84. But other than that, it appears that most of the Defendants Smith and Barnes' allegations stem from one single fact that: That the caller to the Clerk's office "sounded female," (Exhibit C, at p. 12.). And if that caller is, indeed, the Plaintiff, then that must mean that the Plaintiff impersonated someone because the Plaintiff cannot "sound female" as a "biological male" (Exhibit C, at pp. 4, 15).[15]

---

[15] *See ante* at p. 8, n. 9 (incorporating by reference a pleading where the Plaintiff explains how the stereotyped belief that transgender people are "evil deceiver[s] and make-believers who impersonate some fiction is a common historical way of positing that said identity writ large in the law enforcement's petty and limited imagination" (*Id*., at 5, quoting *United States v. Skrmetti*, 605 U.S. 495, 601 (2025), Sotomayor, J., dissenting [collecting authority to support that historical account]). There, the Plaintiff also explained why such a code of conduct is not " 'not just the stab of present insult, but the stinging barbs of history, which catch and tear at the psyche the way thorns tear at the skin[,]' " quoting *Bailey v. S.F. Dist. Attorney's Office*, 16 Cal. 5th 611, 631 (2024), which partially relied on *McGinest v. GTE Service Corp*. 360 F.3d 1103, 1116 (9th Cir. 2004). *See also* ECF No. 129 in *Doe I*, at p. vi, n. 1: "There is so much *Gender Trouble* going on here in Smith's mind, and the Plaintiff is confused. If the Plaintiff is a 'biological male,' how can she sound 'female'? Is the Plaintiff's crime of impersonation sounding 'female' while being a 'biological male'? And did he assume that the Plaintiff impersonated ███████████████████ because she sounded female, like ████████████████ (a cisgender woman), while actually not being a 'female'? Defendant Smith's conception of gender is…incomprehensible to the Plaintiff. And if the alleged impersonator's 'voice sounded female[,]' then how can Defendant Smith claim that it must be the Plaintiff—someone he sees as a 'biological male'? Is the Plaintiff a biological male when it supports the Defendants' assertions and a female when it does not? Should this be construed as Defendant Smith's *sub silentio* admission that gender is not set in some 'biological' stone?" (*Ibid*.; original emphases omitted).

16

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

85. Put differently, *if not* for the Plaintiff's <u>inability</u> to conform with the sex-stereotypes[16] of Defendants Smith, Barnes, and Hernandez and *if not* for the Plaintiff's protected speech as an extension of her Right to Petition in the form of her right to access courts, none of the unconstitutional conduct alleged in *Doe I* would have happened.[17]

<u>At Some Point, SDPS, Smith, Barnes, Morgan-Hermann, and its DOES Fraudulently Crop the ID Card the Plaintiff provided to SDPS two years ago to obtain a police report where she was a victim and shares it with Defendant Shaw with the Explicit Intent and Instructions that Defendant Shaw Starts Investigating the Plaintiff's Admissions Application from Three Years Ago</u>

86. During the same Rule 60(b) proceeding in *Doe I*, the Plaintiff was informed by opposing counsels' moving papers (including a declaration written by Defendant Shaw[18])

---

[16] Indeed, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes[.]" *Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011). *See also Whitaker By Whitaker v. Kenosha Unified Sch. Dist.* No. 1 Bd. of Educ., 858 F.3d 1034, 1048 (7th Cir. 2017) ("By definition a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."). Although there is, of course, substantial debate on this question nationally, in <u>this</u> Circuit, <u>at this time,</u> transgender status is a suspect class *on its own accord. See Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019). *See also Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020)*; affirm'd sub. nom., Hecox v. Little,* 79 F.4th 1009 (9th Cir. 2023) (en banc); *see also Little v. Hecox*, 146 S. Ct. 819 (2025) (petition for a writ of *certiorari* granted, pending disposition of the petition). *See also United States v. Skrmetti*, 605 U.S. 495 (2025) (majority opn. of Roberts, C.J.) (explicitly <u>refusing to reach to the question</u> of as to whether transgender status would constitute quasi-suspect or suspect class that would call into a strict scrutiny analysis). But sex-stereotyping is (and has been since *Price Waterhouse*) a separate basis for an equal protection claim on its own right. This is a lengthy debate that cannot be entertained in a *complaint*, but someone who takes an adverse action against an "**an individual for being […] transgender [takes that action against] that person for traits or actions [they] would not have questioned in members of a different sex**." *Bostock v. Clayton Cty.*, 590 U.S. 644, 651-52 (2020) (emphasis added). Although, of course, *Bostock* was about the textual interpretation of Title VII, its logic has far surpassed the facts of its case.

[17] If the Plaintiff is prosecuted by the State of California because of Defendant Smith's false account of the events and is <u>not convicted</u> of such crimes by the appropriate tribunal of law, of course, the Plaintiff will promptly petition this Court for damages for the unconstitutional conduct she suffered. *See, inter alia, Franks v. Delaware*, 438 U.S. 154 (1978). *See also Thompson v. Clark,* 596 U.S. 36 (2022). And such a petitioning would not be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). But all of this illustrates, at the end, that SDPS is *truly a government actor* because if it was not, how could it initiate criminal prosecutions of residents of its jurisdictional territory?

[18] *See* ECF No. 12-3. The Plaintiff also incorporates this pleading by reference herein as if fully set herein because the Complaint necessarily relies on this declaration and the defendants cannot dispute the originality of a declaration they submitted to the Court in *Doe I*.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

and thereon now alleges[19] that Defendants Smith, Barnes, Morgan-Hermann, and other county DOES cropped the Plaintiff's ID card that was submitted by the Plaintiff in support of her request to receive a police report where she was the victim of an alleged crime and appended that ID card to the new police report fraudulently written by Defendants Smith and Barnes and approved by Defendant Hernandez.

87. The defendants in *Doe I*, for instance, indicated to that court that the ID card was submitted by the Plaintiff during the defendants' purported investigation into the plaintiff's alleged impersonation, but the ID card there came from the request for inspection of records the Plaintiff submitted herself almost 3 years ago.

88. The ID card included in that report is the same one that the Plaintiff submitted—indeed, as alleged *supra*, it was taken on the Plaintiff's desk and is of the same angle, cropping, shading.

89. The Plaintiff is informed and thereon alleges that this ID card was provided to Defendant Shaw by Defendants Smith, Barnes, Morgan-Hermann, Hernandez, Wilson and other SDPS DOES to Defendant Shaw[20] with the clear instruction that he starts investigating the Plaintiff's then-three-year-old admissions application to Defendant Stanford.

90. The Plaintiff is informed and believes and thereon alleges that SDPS and its officers acted in concert with Defendant Shaw and his subordinates to expel the Plaintiff from Stanford as soon and as expediently as possible.

91. Indeed, there is no other cognizable reason as to why this ID card would be provided by SDPS and its officers to Defendant Shaw, given that Defendant Shaw is not a part of SDPS.

---

[19] For abundance of clarity, even after *Iqbal*, a complaint can allege facts on information and belief. "The Ninth Circuit has held that the Iqbal/Twombly plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief. *Flexpand, Ltd. Liab. Co. v. Cream, Inc.*, No. C 19-0878 SBA, 2020 U.S. Dist. LEXIS 265212, at *19 (N.D. Cal. Sep. 9, 2020). *See also Soo Park v. Thompson,* 851 F.3d 910, 928 (9th Cir. 2017).

[20] Defendant Shaw does not dispute and concedes that the ID card was provided to him by SDPS with instructions that he starts investigating the Plaintiff's admissions application. *See* ECF No. 12-3, at p. 3, ¶ 8-12.

18

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

92. As such, from this meeting of the minds, both SDPS and Shaw (and Stanford) would have equally benefitted: Stanford, Shaw, and SDPS have gotten away with a legal liability like the Plaintiff who sues them for their unconstitutional conduct and their other civil wrongs.

93. Indeed, during *Doe I*, Stanford and SDPS made it clear how much they despised the Plaintiff's protected right to petition the government for redress of grievances. For instance, in an overtly condemnatory tone, the defendants in *Doe I* wrote to that court, "She once sued Stanford over one of her grades. She has sued her Stanford RA [*sic*]. And she has initiated multiple spite suits against another Stanford student." Dkt. No. 80 in *Doe I*, at p. 2.

94. They indicated that the Plaintiff's protected speech damaged "their own reputations [and] institutional standing" Dkt. No. 29 in *Doe I*, at p. 13.

95. And they found the Plaintiff's speech in the form of those petitions to be ones that contained "disparaging language" Dkt. No. 29 in *Doe I*, at p. 4.

96. As such, all defendants herein opposed the speech because they, apparently, found it unpalatable to their ears.

Defendant Zumwalt and Her Subordinates Become Involved

97. At a point unknown to the Plaintiff, as the Plaintiff was informed later from a FERPA release by third party (as alleged *infra*), that Defendant Zumwahlt and her subordinates, acting on the ID card intentionally shared with her and Defendant Shaw by SDPS officers for adverse action to be taken against the Plaintiff, contact non-party Rice's Office of General, asking if the latter could provide the first General Counsel of any derogatory information on the Plaintiff that could be used against the Plaintiff. *See* Exhibit D (indicating that "Rice and Stanford general counsels have been i n contact regarding the situation as well).

//

//

//

//

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

<u>Defendant Shaw Secretly Starts his Purported Investigation into the Plaintiff's Then-Three-Year-Old Admissions Application</u>

98. On July 7, 2025, Defendant Shaw emailed the non-party Schilke, with an email entitled "confidential," seeking further information about the Plaintiff.[21] *See* Exhibit D.

99. On the same day, non-party Schilke returned an unofficial transcript obtained from a third-party provider known as the National Clearinghouse, citing 34 CFR § 99.31(a)(2) as the basis for release without consent under Family Educational Rights and Privacy Act.

100. On the same day. Defendant Shaw emailed non-party Schilke again to seek clarification.

101. A day after, non-party Schilke responded to Defendant Shaw's inquiry.

<u>Defendant Shaw Contacts the Plaintiff while Fraudulently Concealing Everything about His Purported Investigation</u>

102. On July 21, 2025, defendant Shaw emailed the Plaintiff, serving the Plaintiff with what the defendants allege is a notice of charges. *See* Exhibit E, at pp. 5-7.

103. The email, in pertinent part, read, "I am reviewing certain matters that have come to Stanford's attention in connection with your application for admission to the University for the Class of 2027. Concerns have been raised that you may have misrepresented information in your application to Stanford [*sic*]. I was recently made aware that prior to entering Stanford in Fall 2023 you may have been enrolled at Rice University [*sic*]. Nowhere in your application, did you indicate enrollment at another degree granting institution when you applied in December of 2022." *See* Exhibit E, at p. 5.

104. On the same notice, a so-purported Permission to Release Education Record Information form was attached.

105. Defendant Shaw's letter also stated, in the pertinent part, "I understand that receiving this information may lead to feelings of stress and anxiety and want to ensure that you know about the resources that are available to you. You can contact the Resident Director (RD) on-call, as well as the RD for your neighborhood to get connected to help resources. In addition, Vaden Health Services offers a variety of confidential services to support

---

[21] Again, this information was released to the Plaintiff on September 3, 2025, by a FERPA release administered by non-party Rice, after the Plaintiff was already expelled.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

your mental and physical well-being. Appointments can be made online or, if you are in crisis, you can get immediate help at any time." Exhibit E, at p. 5.

106. During the Plaintiff's email conversations with Defendant Shaw, Defendant Shaw represented that he needed the consent form so that he could acquire the Plaintiff's alleged and purported transcript, even though he had already obtained the said alleged transcript three weeks before contacting the Plaintiff.

107. For instance, Defendant Shaw wrote to Plaintiff when the Plaintiff provided Defendant Shaw a permission to release records that was narrower than what Defendant Shaw mandated the Plaintiff to sign, Defendant Shaw wrote to the Plaintiff, on August 15, 2025, "Yes I received your version. However, I want you sign the form I sent you which that will embrace relevant records including official **transcripts** for our review." *See* Exhibit E, at pp. (emphasis added).

108. In his declaration in support filed in *Doe I*, which had been incorporated by reference herein, Defendant Shaw, for instance, declared under the penalty of perjury that he did not "'attempt to coerce' [the undersigned] into signing a FERPA release." ECF No. 12-3, at ¶ 15.

109. Defendant Shaw also declared that he "asked Ms. Doe to sign a FERPA release allowing Rice [*sic*] to communicate openly with me about Ms. Doe's attendance at Rice. Ms. Doe refused to do so throughout my investigation. **She did not explain why** in any way that I found credible or convincing. If events with Rice were truly as she represented them to be, I would have expected her to sign the FERPA waiver so I could confirm those facts myself. It was important for me to receive the FERPA release so I could verify Ms. Doe's claims." ECF No. 12-3, at ¶ 16 (emphasis added).

110. But, of course, the summarized events of the Plaintiff that **Defendant Shaw did not dispute** was summarized by the Plaintiff as follows: "Also, please stop attempting to coerce me into signing a legal contract for you that I have repeatedly indicated I do not want to sign. During our meeting, I wanted to speak with you about this matter in good faith and explain my side, but you chose to spend 25 minutes of a 30- minute conversation on yelling at me to sign the release form. Such conduct is really not nice and exceeds the bounds of acceptable professional conduct." Exhibit E, at pp. 134.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

111. And Defendant Shaw's recitation of events leading up to the alleged not signing of the contract is also misleading. For instance, the Plaintiff indicated to Defendant Shaw: "As I indicated to [Mr. Shaw] in my July 21, 2025, electronic mail, I will not be able to sign the FERPA release form without fully understanding and cognizing its consequences and, therefore, respectfully request more time to be provided to me by your Office so that I can liaise with legal aid to better understand the consequences of my actions. I am not a lawyer and, much to the disappointment of my parents while growing up, do not intend to become one[.]"Exhibit E, at p. 10.

112. And Defendant Shaw's **undisputed** record of the events was further summarized by the Plaintiff as follows: "Further, I want to note that I remain appalled by what *appears to me your desire to prevent me from getting advice of counsel while proceeding in this matter*. As things stand, a retainer agreement with an attorney cannot be reasonably reached with the abrupt time frames you have been providing to me. I have been trying to retain Ms. Nia Wahl for representation in this matter, but it is going to take some time to be able to do so. To that end, I *did not* decline to sign the FERPA release for you, but indicated that I would like to receive legal advice before doing so. I am unsure why that **very reasonable request** strikes you as unreasonable and something that cannot be accommodated. You indicate that I entered into a contractual agreement with the University that "requires" me to sign the release. Looking over my application (see attachment), I cannot see the contractual term you are citing in the application form I signed. Please provide the exact location of that contractual term. Further, I have provided you with 56 pages of exhibits. I have asked if you still require the FERPA release after having read the exhibits. I have not received an answer to that question. **I repeatedly** indicated to you that I intended to be fully cooperative with your investigation, and your characterization to the opposite strikes me as unfair." Exhibit E, at pp. 78 (italics added for emphasis).

113. It remains curious to the Plaintiff that if Defendant Shaw was so confident that the Plaintiff had done something wrong, *he,* himself, would be willing to wait until the Plaintiff obtained counsel so that the Plaintiff would receive the process that was due to her. Further, the Plaintiff finds Defendant Shaw's implied inference that *because* the

22

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

undersigned wanted to consult the advice of counsel, the undersigned must be somehow guilty…unsettling.

114. And, of course, although Defendant Shaw declared under the penalty of perjury that he did not coerce to Plaintiff into signing a consent form, Plaintiff's **undisputed-by-Defendant-Shaw** recitation of events were conveyed as follows: "As discussed in our meeting today where you stated that you would rescind my admissions if I didn't sign the FERPA agreement, I am attaching the signed waiver here." Exhibit E, at pp. 121 and 124 (the waiver form signed and duly-executed).

115. During this process, Defendant Shaw was also made aware that the Plaintiff made a request to inspect records and amend educational records per the provisions of 20 U.S.C. § 1232. *See* Exhibit F (a copy of the request to amend records and the setting of a hearing on it thereto).

116. Indeed, this request was sent by the Plaintiff to non-party Rice to ensure that the non-party updated their records to ensure that the Plaintiff was not a proper a student at the non-party's organization but only attended the university's orientation week.

117. Indeed, the reason why the narrower Release form was signed by the Plaintiff was because the Plaintiff wanted to ensure that Defendant Shaw received the record that the Plaintiff was disputing the educational records held by non-party Rice and was in the process of amending them.

118. That request for amendment is still waiting disposition and was awaiting disposition when Defendant Shaw made his decision to expel the Plaintiff.

119. Indeed, Defendant Shaw was even told: I'm not trying to delay your review, but Rice is taking a long time to respond to my request that my date of enrollment be corrected. The law requires them to make amendments within a 'reasonable time' frame, and they told me that they would get back to me next month. I included in my initial email their response to my request for amendment. I suspect that you want your review to conclude before the start of the new academic year. If that is the worry, and if you do not want me to be enrolled in classes while your review is continuing, I can take a leave of absence until your review is complete." Exhibit E, at p. 131.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

120. It is unclear to the Plaintiff why Defendant Shaw would want to base his decision on records that were under FERPA amendment or why he would not wait for that process to be adjudged accordingly if his intent in his purported investigation was to 'discover the actual truth' instead of expelling the Plaintiff as soon and as quickly as possible.

121. It appears that in addition to his email entitled "confidential[,]" defendant Shaw received some additional information from non-party Rice in August 2025.

122. No opportunity to dispute any of the purported evidence purportedly obtained from non-party Rice before it adjudged the undersigned's FERPA amendment request was presented to the Plaintiff so as to afford the Plaintiff an opportunity to challenge the veracity of the purported evidence and respond to it. *See, e.g.,* Exhibit E, at pp. 77-79. (querying whether Defendant Shaw would release the operative record before him and never receiving that record).

All Defendants Intentionally Cause the Plaintiff's Suicide Attempt

123. During this time, the Plaintiff vigorously attempted to contact the purported 'sources' Defendant Shaw identified in his initial communication when he acknowledged that his letter could cause "feelings of stress and anxiety."

124. The Plaintiff contacted Defendant Jacobs, with whom the Plaintiff exchanged communication at length, given that he was the most senior official in charge of Vaden Health Services' mental health resources.

125. During these conversations, Defendant Jacobs conceded that none of the allegedly available resources would be available to the Plaintiff as the Plaintiff was outside the United States and California state law required the presence of the Plaintiff in California for a therapeutic relationship to be established.

126. During this time, the Plaintiff repeatedly communicated to Defendant Shaw that his communication and conduct was causing intense anxiety to the Plaintiff, to the point where the Plaintiff was experiencing asphyxiation and was considering committing suicide, given that without Stanford, the Plaintiff would be left in a very vulnerable position.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

127. The Plaintiff also also communicated with Defendant Jacobs during this time, indicating that the Plaintiff was experiencing intense symptoms of anxiety, including asphyxiation, and that the Plaintiff was suicidially ideated.

128. Defendant Shaw, and Defendant Jacobs, ignored most of these communications, and Defendant Shaw continued to attempt to coerce the Plaintiff into signing his consent form.

129. In late July, unable to cope with the stress Defendant Shaw's conduct brought the Plaintiff, and unable to reach out to any mental health crisis resources, the plaintiff attempted to commit suicide by taking at around 250 pills of various medication. Although the Plaintiff was not conscious after that, it is the Plaintiff's understanding is that a gastric lavage was performed on the Plaintiff, and the Plaintiff was resuscitated.

Defendants Shaw and Devlin's Zoom Meeting with the Plaintiff and their Coercion, Compulsion, and Threats Thereof

130. After the Plaintiff refused to sign Defendant Shaw's incredibly broad consent form, based on the advice of counsel that was retained by the Plaintiff thereafter, Defendants Shaw and Devlin ordered the Plaintiff to appear for a Zoom meeting.

131. Although the Plaintiff generally alleged what happened during that Zoom meeting *ante,* the Plaintiff shall supplement the allegations of what took place during that meeting as follows.

132. Generally, Defendants Shaw and Devlin went through some of their allegations and asked the Plaintiff for a response.

133. When the Plaintiff inquired how she could prove to Defendant Shaw that she was not an active student at non-party Rice and that she only attended orientation week and thereafter decided to not be a student at Rice, Defendant Shaw replied with something along the lines of, "well, they have to tell us that, look, *he* was not a student here[.]" (italics added).

134. When the Plaintiff explained that she was in the process of amending her records with non-party Rice, Defendant Shaw nodded but did not indicate as much.

135. The Plaintiff explained to Defendant Shaw that the Plaintiff only attended an orientation event at non-party Rice and, then, decided to take a gap year as she wanted to

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

spend a gap year focused on her gender transition and began college presenting as female. The Plaintiff also indicated to Defendant Shaw that this action was taken after the Plaintiff learned that she would not be able to receive adequate medical care in Houston, TX, because there was no medical provider within the city that provided gender-affirming medical care without waiting periods or one that provided such medical care on an informed-consent basis.

136. The Plaintiff informed Defendant Shaw that she was located in Cambridge, MA for most of the year during the 2022-2023 academic year and she could not have taken classes at non-party Rice as that would have required the Plaintiff's presence in another state.

137. Plaintiff asked if she could be provided a copy of the operative record before Defendant Shaw so that the Plaintiff could be afforded an opportunity to challenge the authenticity of the purported evidence before Defendant Shaw and respond accordingly.

138. Defendant Shaw said something to the effect of, "No, I do not have to do that, and I will not do that."

139. When the Plaintiff asked Defendant Shaw if he would be holding a hearing for the Plaintiff to be able to challenge her possible expulsion, the Plaintiff was told by Defendant Shaw that he will not hold a hearing and he was not required to do so.

140. When the Plaintiff asked Defendant Shaw if they could meet again so that the Plaintiff could respond to Defendant Shaw's allegation at more length, Defendant Shaw answered in the affirmative.

141. Indeed, as uncontested by Defendant Shaw, the Plaintiff, right after the meeting wrote to Defendant Shaw, indicating: "Please indicate when you will be available for a second meeting, to which I look forward." Exhibit E, at p. 120.

142. Defendant Shaw, however, expelled the Plaintiff before holding a second meeting.

143. Although not necessarily relevant to the Complaint, the Plaintiff indicated, once again, that she was "skeptical and deeply appalled that this email is arriving in [her] mailbox a month after [she] filed a [42 U.S.C §] 1983 action against Stanford in a

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

federal district court" and that "this move, in some sense, feels very retaliatory." Exhibit E, at p. 9.

144. The Plaintiff asked if Defendant Shaw would terminate his investigation if the Plaintiff dismissed the *Doe I* action.

145. Defendant Shaw nodded and indicated to the Plaintiff that she should "talk to the lawyers" "in order to make that happen." (or something to the proximate effect thereof).

<u>Plaintiff Dismisses *Doe I* and the Plaintiff is Expelled Three Hours After the Stipulation is Filed</u>

146. The Plaintiff entered into a stipulation dismissing *Doe I* with prejudice.

147. Defendant Shaw sent a letter expelling the Plaintiff two or three hours thereafter.

<u>Plaintiff's Entering into a Contractual Relationship with Defendants</u>

148. When the Plaintiff was applying for admission into Defendant Stanford, in order to be able to transmit her application, she signed a written contract that indicated that the Plaintiff and Defendant Stanford's contractual relationship during the admissions process was that she "may be subject to a range of possible disciplinary actions, including admission revocation, expulsion, or revocation of course credit, grades, and degree should the information I have certified be false[.][22]"

149. Plaintiff was offered this contract, considered it, and accepted it.

150. The Plaintiff was legally competent during this acceptance.

151. The Plaintiff signed this contract by signing her then-legal name underneath it, which, then, transmitted the Plaintiff's application to Defendant Stanford.

152. When Defendant Stanford downloaded the Plaintiff's application from the Common App portal that it contracted for its undergraduate admissions applications, the Plaintiff is informed and thereon alleges that Defendant Stanford also signed the contract in question, agreeing to its terms.

153. This contract imposed upon the condition on the Plaintiff of not providing 'false' information during the admissions process and imposed upon Defendant Stanford the

---

[22] The Plaintiff incorporates by reference this contract, found at https://perma.cc/6N33-62DA .

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

condition of not *revoking* the Plaintiff's admissions application and admission thereto unless 'false' information was provided on the application.

154. The Plaintiff performed her part of the contract—she did not provide any *false* information on the application.

155. Indeed, even if assuming, *arguendo*, the Plaintiff wanted to provide false information, she could not have because Defendant Stanford's application did not ask if the Plaintiff was "enroll[ed] in another degree granting institution" Exhibit E, at p. 5 or if she was "a degree-seeking student at another university[.]" Exhibit E, at p. 165-166.

156. Defendant Stanford breached this contract by revoking the Plaintiff's admission even though the Plaintiff performed what was required from her by this contract.

157. When Stanford offered the Plaintiff an admission spot, the Plaintiff accepted that spot, paid a security deposit of around $200, and then matriculated to Defendant Stanford.

Defendant Shaw's Decision Letter and Following Events

158. Defendant Shaw's August 21, 2025, letter of expulsion, on its face, informed the Plaintiff that the letter was transmitted to "[r]elevant offices" and that they "may be in touch with [the Plaintiff] directly regarding any next steps including with respect to any university housing, financial aid, and other matters[,]" including "[a]ny visa-related" matter by the "Bechtel International Center." Exhibit E, at p. 166.

159. The letter on its face indicated that the Plaintiff lied in her admissions application.

160. The letter also indicated that the Plaintiff was enrolled in non-party Rice for a year despite the Plaintiff only being there for merely two weeks for orientation.

161. Based on Defendant Shaw's letter, Defendant Zartoshty cancelled the Plaintiff's Student and Exchange Visitor Information System (SEVIS) record, which was in her possession, effectively annulling her student visa.[23]

162. Based on Defendant Shaw's letter, Defendant Everett cancelled the Plaintiff's residential on-campus housing contract.

---

[23] When a SEVIS record is cancelled, such a cancellation *de facto* nulls the the ability of someone to use an F-1 student visa. *See, e.g., Doe v. Trump*, 784 F. Supp. 3d 1297, 1308 (N.D. Cal. 2025). ["[W]hen a SEVIS record is terminated …, an F-1 nonimmigrant … cannot re-enter the United States on the terminated SEVIS record."]

28

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

163. Although the Plaintiff does not have a copy of this contract because it was sent for signature to the Plaintiff's Stanford email address which has now been shut down, the Plaintiff entered into a contract with Defendant Stanford that provided her with on-campus housing between "September 12, 2025 and June 15, 2026" *See* Exhibit H.

164. The contract was signed by the Plaintiff and either Defendant Everett or her agents authorized to sign the contract on her behalf after presentation of the contract, deliberation, and acceptance of its provisions.

165. To the extent that the contract mandated the Plaintiff to be an active student to be able to receive the benefit of housing from that contract, the Plaintiff was excused from that part of the contract because of Defendant Shaw breaching yet another contract and forcing the Plaintiff to not be able to fulfill that part of her housing contract.

166. And, other than the excused portion of the contract, the Plaintiff performed her obligations under that contract.

167. Defendant Everett, or her agents, breached that contract by not providing the Plaintiff with the promised housing.

168. Defendant Shaw's letter also indicates that all of my earned credits from *two years* of college education are *retroactively* vacated.

169. These credits were earned after the Plaintiff entered into an implied-in-facts contract with Defendant Stanford where the Plaintiff would render services to Defendant Stanford by being a student, as Defendant Stanford cannot *really* exist without its students as an educational institution.

170. The Plaintiff earned these credits appropriately and with hard work, and now the Defendant is attempting to not render what the Plaintiff is owed by being a proper student in its institution—in the form of course credits.

Plaintiff Asks Defendant Shaw His Communication with Non-Parties and He Denies Ever Communicating with Them

171. At or around the second week of August, the Plaintiff contacted Defendant Stanford's designated email address for requests for inspection of records as per the provisions of 20 U.S.C. § 1232g and 34 CFR Part 99.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

172. Plaintiff indicated that she wished to receive all of her records held by Defendant Shaw and his office.

173. The Plaintiff received a response on or about August 20, 2025, indicating that there were no such records available.

A FERPA release is released to the Plaintiff in September 2025 by Non-Parties

174. The Plaintiff received a response to her request for inspection from non-party Rice on September 2025, after Defendant Shaw issued his decision.

175. Only then was the Plaintiff aware of the *partial* purported evidence relied on by Defendant Shaw to expel the Plaintiff—evidence he did not share with the Plaintiff for a reasonable opportunity to contest. *See* Exhibit F.

Plaintiff Discovers on April 17, 2026, that the Complaint in *Doe I* was Before Defendant Shaw when He Made His Decision

176. On April 17, 2026, the Plaintiff's counsel in a California writ of administrative mandate petition sent what is lodged with this Court at Exhibit G.

177. As the Defendants have conceded that record could only include documents that were before the administrative officer (Defendant Shaw) while he was making his administrative decision. *See* Dkt. No. 80 in *Doe I*, at p. 4, n. 4 (arguing that *only evidence before administrative board officer* could be included in the administrative record).[24]

178. As such, if Defendant Shaw's decision to expel the Plaintiff was *not* motivated by the previous suit in this Court in *Doe I*, the complaint therein would not have been included in that administrative record. *See* Exhibit G, at pp 239-364.

Plaintiff Discovers on April 20, 2026, that the Plaintiff's ID card was shared with Defendant Shaw with a Meeting of Minds to Expel the Plaintiff

179. While reading the moving papers submitted in opposition to the Plaintiff's Rule 60 (b) motion in *Doe I* was the Plaintiff informed that SDPS and its officers had a meeting of mind with Defendant Shaw to have the Plaintiff be expelled.

180. This Complaint was filed a day after the hearing on the Rule 60(b) motion concluded.

---

[24] The Plaintiff incorporates this pleading as if fully set herein as well as the Complaint relies on it. The Plaintiff further requests judicial notice of *this* pleading filed by the Defendants in another court action.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT

## I. FIRST CLAIM TO RELIEF
42 U.S.C. § 1983 VIOLATION
(Violation of the First Amendment of the United States Constitution—Right to Freely Petition the Government for Redress of Grievances without Retaliation)
(Against All Defendants Except Defendant Jacobs)

181. Plaintiff incorporates all paragraphs, as though fully set forth herein.

182. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to her by the First Amendment to the United States Constitution.

183. The First Amendment protects the Plaintiff's right to, *inter alia*, petition the government for redress of grievances.

184. All of the acts complained of herein were retaliatory and directed toward the Plaintiff because of her initial complaint to this Court or because of her other Constitutionally-protected petitioning activity.

185. Acting with malice and oppression, defendants acted deliberately to intimidate and silence Ms. Doe in her constitutionally protected petitioning activity.

## II. SECOND CLAIM TO RELIEF
42 U.S.C. § 1983 VIOLATION
(Violation of the First Amendment of the United States Constitution—Right to Freely Petition the Government for Redress of Grievances without Retaliation)
(Against All Defendants Except Defendant Jacobs)

186. Plaintiff incorporates all paragraphs, as though fully set forth herein.

187. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to her by the First Amendment to the United States Constitution.

188. The First Amendment protects the Plaintiff's right to, *inter alia*, speak and write freely without government interference or retaliation.

189. All of the acts complained of herein were retaliatory and directed toward the Plaintiff because of the words "contained within [the Plaintiff's] [...] lawsuit" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387-389 (2011).

190. Acting with malice and oppression, defendants acted deliberately to intimidate and silence Ms. Doe in her constitutionally protected speech.

31

PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT

### III. THIRD CLAIM TO RELIEF
42 U.S.C. § 1983 VIOLATION
(Violation of the Fourteenth Amendment of the United States Constitution—Procedural Due Process)
(Against Defendants Shaw, Devlin, Casebeer-Blum, Zartoshty)

191. Plaintiff incorporates all paragraphs, as though fully set forth herein.

192. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to her by the First Amendment to the United States Constitution.

193. Procedural due process requires government officials to follow fair procedures before depriving a person of life, liberty, or property. When the government seeks to deprive a person of one of those interests, procedural due process requires the government to afford the person, at minimum, notice, an opportunity to be heard, and a hearing before and a decision made by a neutral decision-maker.

194. The Plaintiff had a property interest in her college education, her continued enrollment in university after admission, in her bachelor's degree and in her ultimate diploma.

195. The Plaintiff had a liberty interest in her continued SEVIS record.

196. The Plaintiff also had a liberty interest in the revocation of her admission because marking the Plaintiff as an academic fraud destroyed the Plaintiff's "good name, reputation, honor, or integrity[.]" *Wisconsin v. Constantineau*, 400 U. S. 433, 400 U. S. 437 (1971); *Board of Regents v. Roth* 408 U. S. 564, 573 (1972).

197. Acting with malice and oppression, defendants acted deliberately to deprive the Plaintiff of her reputation, good name, honor, integrity, property, and liberty without providing the Plaintiff with the process that was due to her.

### IV. FOURTH CLAIM TO RELIEF
42 U.S.C. § 1983 VIOLATION
(Violation of the Fourteenth Amendment of the United States Constitution—Substantive Due Process)
(Against Defendants Stanford, SDPS, Smith, Barnes, Hernandez, Morgan-Herman, DOES 1-15, Shaw, Devlin, Casebeer-Blum, Zumwahlt, ROES 1-10)

198. Plaintiff incorporates all paragraphs, as though fully set forth herein.

199. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to her by the

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
5:26-cv-03809-BLF

First Amendment to the United States Constitution.

200. Among others, the following substantive due process rights were violated during the defendants civil wrongs: (1) Equal Protection of the Law Regardless of the Plaintiff's Sex and Its Attributes, (2) Substantive Due Process Right to Acquire Useful Knowledge, (3) Substantive Due Process Right to Pursue Occupation, (4) Substantive Due Process Right to Personal Autonomy.

201. Acting with malice and oppression, defendants acted deliberately to deprive the Plaintiff of these substantive due process rights.

## V. FIFTH CLAIM TO RELIEF
42 U.S.C. § 1985 VIOLATION
(Civil Conspiracy against Rights)
(Against All Defendants)

202. Plaintiff incorporates all paragraphs, as though fully set forth herein.

203. Defendants—and each of them, acted as described herein *supra*, in conspiracy with, and with the agreement, permission, ratification, and approval of each other to violate Ms. Doe's civil rights afforded under the United States Constitution.

204. Defendants acted in conspiracy and with agreement, permission, ratification, and approval of their joint conduct to (1) retaliate against the Plaintiff for invoking her constitutional right to petition the government for redress of grievances, (2) retaliate against the Plaintiff for invoking her constitutional right to speak freely, (3) to enjoy procedural due process, (4) to enjoy substantive due process.

205. Because none of the events in this complaint would have happened *if not* for the Plaintiff's protected speech and petitions, the Plaintiff will likely prevail on her First Amendment claims.

206. Plaintiff also prevails on her First Amendment claims because the said petitioning activity created a 'class of one' of the Plaintiff, where the defendants marked the Plaintiff as a legal liability that should be dispensed with because the Plaintiff was not content with letting the defendants' unconstitutional conduct take reign.

207. Defendant Shaw admits, at ECF No. 12-3, at ¶ 5, that he received an almost identical complaint as someone not belonging to the class of one of the Plaintiff where it was alleged that "the student had matriculated at another school and not disclosed it in her

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

application" but instead of investigating it, he did not "did not take action against the other student in this case." *Ibid*.

208. There is no rational basis to explain why Defendant Shaw would not take action on the other student but on the Plaintiff if not for the Plaintiff's being in a class of one as a 'trouble student' who has sued them.

209. As such, if the Plaintiff was not marked as a class of one for being what might be deemed as a 'bad child' who sues Stanford and creates liability for their unconstitutional entrenchment of the rights of their students, the Plaintiff's admissions application would not have been investigated, let alone revoked.

210. Because none of the events in this complaint would have happened—including and most importantly, the Plaintiff's expulsion—*if not* for Defendants Smith, Barnes, and Hernandez' exclusion of the Plaintiff as a member of a protected class of sex—and their stereotyping of her sex-based attributes—because *if not* for that, SDPS Defendants would have never conspired with Defendant Shaw to let him start 'investigating' the Plaintiff's four-year-old admissions application because of the said ID card *unless* the Plaintiff was a "biological male" who sounded like a "female", the Plaintiff will likely prevail on the substantive due process claims because the conduct herein occurred because of the Plaintiff's sex and her attributes driven from her sex.

211. Because none of the defendants herein would have conspired with Defendants Shaw, Casebeer-Blum, Devlin and Zartoshty to deprive the Plaintiff of her liberty and property interests without due process of the law *absent* the class of one created because of the Plaintiff's protected speech and petition, and because of the Plaintiff's membership in the class of transgender women (*i.e.* "biological men" who "sound female"), the Plaintiff would likely prevail in a claim of civil conspiracy against the Plaintiff's procedural due process rights.

212. Plaintiff would likely prevail on Fourteenth Amendment claims because the creation of the Plaintiff as a class one because her protected speech and petitions would entail the invocation of Fourteenth Amendment protection by way of incorporation. *See, e.g., Gitlow v. New York*, 268 U.S. 652 (1925) and *Fiske v. Kansas*, 274 U.S. 380 (1927).

//

PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT

## VI. SIXTH CLAIM TO RELIEF
VIOLATION OF TOM BANE CIVIL RIGHTS
ACT
(California Civil Code, section 52.1)
(Against All Defendants)

213. Plaintiff incorporates all paragraphs, as though fully set forth herein.

214. Defendants violated Plaintiff's clearly established rights under the United States and California Constitutions, as well as state and federal law, which include, but are not limited to, the following:

   a. First Amendment to the United States Constitution

   b. Fourteenth Amendment to the United States Constitution

   c. California Constitution[25], Article 1

      1. Right to Privacy

      2. Right to Happiness

      3. Right to Free Speech

      4. Right to Free Petitioning Activity[26]

      5. Right to Procedural Due Process

208. Defendants violated the Plaintiff's clearly established rights under United States, and California law by threats, intimidation, and/or coercion. Further, each act and/or violation of rights done by each Defendant to Plaintiff was done by way of threats, intimidation, and/or coercion beyond that inherent in each act and/or violation of rights itself.

209. Although it is unlikely that any party herein falls within the scope of California Government Code, sections 811.2 and 811.4, on or about April 30, the Plaintiff mailed

---

[25] "The California Constitution is a document of independent force and extends a guarantee of basic civil rights to the people of this state, independent of and broader than parallel rights afforded under the federal Constitution." *People v. Maxie*, 105 Cal. App. 3d 904, 165 Cal. Rptr. 4, 6 (1980). (collecting cases) (citations and inner quotation marks omitted).

[26] It is not settled law if the California Constitution's free speech and petition clauses require a state actor. This is a very complicated question that cannot be addressed herein. *See,* pertinently, *Golden Gateway Center v. Golden Gateway Tenants Assn.* 26 Cal.4th 1013 (2001); *see also Robins v. Pruneyard Shopping Center,* 23 Cal. 3d 899 (1979). There is also a question as to whether the provisions of *Marks v. United States,* 430 U.S. 188 (1977) apply to determine the binding part of the *state* Supreme Court decisions when no one opinion received a majority vote, making *Golden Gateway* even more confusing.

35

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

out a DGS ORIM 006 form to California Department of General Service with a $25.00 money order included in the USPS mailing packet.

210. The Plaintiff soon left the United States and was unable to return and is, therefore, unsure if any response on it has been rendered by the Department.

## VII. SEVENTH CLAIM TO RELIEF
VIOLATION OF UNRUH CIVIL RIGHTS ACT
(California Civil Code, section 51)
(Against All Defendants)

211. Plaintiff incorporates all paragraphs, as though fully set forth herein.

212. Unruh Civil Rights Act provides "[a]ll persons within the jurisdiction of this state [to be] free and equal, and no matter […] their sex, […]  are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments[27] of every kind whatsoever." Cal. Civil Code, section 51 (b).

213. The act provides an expansive definition of "sex" at Cal. Civil Code, section 51 (e) (6).

214. All of these actions took place in a business establishment of a private university, which charges tuition for its students to be able to be present on its campus and charges housing fees for its on-campus housing accommodations.

215. Because the Plaintiff was treated differently based on her sex and its attributes and would not have been denied full access herein if not for her sex, and because the Plaintiff's sex was the only motivating factor for the discrepancy in enjoying equality and liberty, Plaintiff is entitled to damages under the Unruh Civil Rights Act.

---

[27] Although this is likely a question that must be left to briefing, there has been substantial recent dispute as to what would constitute a "business establishment" within the meaning of the Unruh Civil Rights Act. For almost a century, the state Supreme Court admonished lower courts to not impose a rigid reading of a business establishment. Whether a defendant is a "business establishment" under the Unruh Civil Rights Act is a question of law. *Rotary Club of Duarte v. Bd. of Dirs.*, 178 Cal. App. 3d 1035, 1050, 224 Cal. Rptr. 213 (1986). An organization has sufficient business attributes to qualify as a "business establishment" under the Unruh Act when it appears to operate in a capacity that is the functional equivalent of a commercial enterprise. *See Carter v. City of Los Angeles*, 224 Cal. App. 4th 808, 825 (2014). There is a seven-prong test used for this determination. *See Harris v. Mothers Against Drunk Driving*, 40 Cal.App.4th 16, 20 (1995). Although this test was recently supplemented in *Brennon B. v. Superior Court*, 13 Cal. 5th 662, 296 Cal. Rptr. 3d 360, 513 P.3d 971 (2022), a public high school district is quite different than a private university's housing services, its admissions department, its police force, and so forth.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

216. The *per se* derogatory statements made by the defendants make it reasonable to conclude that the discrimination in question was intentional and made with malice and oppression.

## VIII. EIGHT CLAIM TO RELIEF
INTRUSION UPON SECLUSION[28]
(Against SDPS, SMITH, BARNES, HERNANDEZ, DOES 1-15, SHAW, DEVLIN, CASEBEER-BLUM, ZUMWAHLT, ROES 1-10)

217. Plaintiff incorporates all paragraphs, as though fully set forth herein.

218. This claim is two-fold: It is against SDPS and its officers who shared the Plaintiff's ID card on their file because the Plaintiff obtained a police report where she was a victim and shared it with Defendant Shaw for Defendant Shaw to start investigating the Plaintiff's four-year-old admissions application. It is also against Defendant Shaw for intruding upon the Plaintiff's seclusion of her ID card.

219. The second part of this claim is against Defendant Zumwahlt, ROES 1-10, and Defendant Shaw for obtaining the Plaintiff's student-record information from another educational institution by invoking the statutory exemption for consent under FERPA as codified in 34 CFR § 99.31(a)(2) by fraudulent conduct.

220. Based on the allegations incorporated herein, defendants Zumwahlt, ROES 1-10, and Defendant Shaw seem to have intruded upon the Plaintiff's secluded matters by claiming that the obtainment of such information was "for purposes related to the student's enrollment or transfer." 34 CFR § 99.31(a)(2).

221. *First*, it must be noted that the technical meaning rule should apply herein for interpreting the statute at 34 CFR § 99.31(a)(2) because it satisfies the text found in *Van Buren v. United States*, 593 U.S. 374 (2021). The statute is addressed to the specialized audience of educators and it uses *swaths* of highly technical educational terms. It is clear

---

28 In *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Supreme Court found that there is no cognizable private-party claim for damages available to a plaintiff under a 42 U.S.C. § 1983 analysis for wrongful release and obtainment of school-record information by way of claiming a violation of the provisions of Family Educational Rights and Privacy Act. But the plaintiff therein prevailed on his common law state claims. *See generally Doe v. Gonzaga Univ.*, 24 P.3d 390 (Wash. 2001) (reversing the Court of Appeal and affirming the trial court's judgement of $1 .IM in damages for, inter alia, defamation and intrusion upon seclusion for wrongful release and obtainment of student-record information in violation of FERPA.)

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

that Defendant Shaw herein, as an educator, was aware of the difference, for instance, between the technical terms 'enrollment,' 'transfer,' 'matriculation,' 'first-year student.'

222. The entire point of the Plaintiff's expulsion is that, allegedly, she should *have been* a transfer student but that she was not because she did not apply as such. It is manifestly absurd to claim that the FERPA consent exemption applies to a student the Defendants have conceded was not a transfer student and to claim that the obtainment of highly sensitive student record information was authorized "for purposes related to the student's […] transfer." *Ibid*.

223. The requested student-record information could also *not* be "for purposes related to the student's enrollment[.]" 34 CFR § 99.31(a)(2).

224. The Plaintiff was *already enrolled*, so the purpose cannot have been for the purposes of 'enrollment.' The statute could have easily used the word 'continued enrollment' if it wanted its reach apply to non-transfer students.

225. 34 CFR § 99.31(a)(2) was intended for use for a transfer applicant. The Defendants cannot, at the same time, maintain that the Plaintiff was *not* a transfer student, but they could obtain information without a consent form from the Plaintiff that was intended for transfer students.

226. The intrusion, and the way in which was made as protected speech retaliation and Defendants Zumwahlt, ROES 1-10, and Shaw, fraudulently telling non-party Rice that the obtainment of record was for the purposes related to the student's enrollment and transfer when it was *obviously not*, would be highly offensive to a reasonable person.

### IX. **NINTH CLAIM TO RELIEF**
DEFAMATION—LIBEL PER SE AND PER QUOD
(California Common Law and Civil Code § 45)
(Against Defendant Shaw)

227. Plaintiff incorporates all paragraphs, as though fully set forth herein.

228. This claim arises from Defendant Shaw's August 21, 2025, letter, which was communicated, as he concedes, to high number of third-party individuals.

229. The *per se* theory of defamation herein is Defendant Shaw's assertion as fact that the Plaintiff was not honest in her admissions application to Stanford and the implied

38

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

assertion that the Plaintiff is an academic fraud. This is exactly the kind of speech that would *per se* constitute libel.

230. This statement was presented as factual not as Defendant Shaw's opinion of the Plaintiff's character.

231. This statement is false. There was no 'dishonest' information on the Plaintiff's application. The statement was part of unprivileged communication; it was clear that it was about the Plaintiff as the Plaintiff's legal name appeared on the document; the statement was made in reckless disregard and/or negligence about the truth.

232. The libel *per quod* here is the Defendant Shaw's assertion-of-fact that the Plaintiff attended non-party Rice for a year.

233. The statement is false. The Plaintiff did not. The false statement injured the Plaintiff by way of losing her rental contract and her student visa because Defendant Shaw's defamatory remarks were directed at his colleagues at the International Student Center and Student Housing.

## X. TENTH CLAIM TO RELIEF
### BREACH OF CONTRACT
### (Against Stanford)

234. Plaintiff incorporates all paragraphs, as though fully set forth herein, particularly ¶ 144 through ¶166.

235. There are two written contracts involved here: (1) the Admissions contract as was alleged *supra*, and (2) the housing contract, as was alleged *supra*.

236. The Plaintiff finds that incorporated paragraphs plead a breach of written contract sufficiently and cognizantly and will not repeat them herein.

## XI. ELEVENTH CLAIM TO RELIEF
### BREACH OF IMPLIED-IN-FACT CONTRACT
### (Against Defendants Stanford and Zartoshty)

237. Plaintiff incorporates all paragraphs, as though fully set forth herein.

238. This implied-in-fact contract claim to relief consists of two implied-in-fact contracts: (1) The Plaintiff's continued enrollment in a university in which she was admitted and matriculated until her graduation with a bachelor's degree and (2) the Plaintiff's

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

continuation of her SEVIS record until her graduation.[29]

239. When the Plaintiff accepted the offer of admission by Stanford, paid the requisite fee for enrollment thereto, and was matriculated, the Plaintiff entered into an implied-in-fact contract: The Plaintiff was to be provided with an undergraduate education and a degree at the end of that education, provided that she was a student in good standing.

240. The Plaintiff was a student in good standing. She upheld her part of the implied-in-fact contract.

241. Stanford breached that implied-in-fact contract by not providing the Plaintiff what it entered into a contract to do by *its actions* as an educational institution: Educate the Plaintiff until she graduated.

242. Stanford also, by the act of providing a SEVIS record to the Plaintiff shortly after matriculation and allowing her to get a student visa until 2028, created an implied contract by its *actions* that the Plaintiff's SEVIS record would not be terminated until and after she graduated.

243. To the extent that the Plaintiff was not able to be a full-time student because of Stanford's breach of the written admissions contract, the Plaintiff was excused from being a full-time student because of Stanford's arbitrary breach of the written contract.

244. Stanford breached these two implied-in-fact contracts by revoking her SEVIS status and not allowing the Plaintiff to be continually enrolled.

### XII. TWELTH CLAIM TO RELIEF
BREACH OF IMPLIED-IN-LAW CONTRACT/*QUANTUM MERUIT*
(Against Stanford)

245. Plaintiff incorporates all paragraphs, as though fully set forth herein.

246. This quasi-contract claim herein follows intuitively and naturally: When the Plaintiff was admitted to Stanford, she was requested to be a student at Stanford. And she

---

[29] As a matter of California state law, "the basic legal relationship between a student and a private university is contractual in nature." *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 823-24, 67 Cal. Rptr. 3d 635, 645-46 (2007) (collecting authority). "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created." *Ibid.* (collecting authority again) (citations and internal quotation marks omitted). "Once a university has admitted a student, the terms of this implied-in-fact contract are [to be] analyzed[.]" *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 811 (2007)

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

accepted that request.

247. And, as a student for two years at Stanford, she took courses, implicit in Stanford's request from the Plaintiff to be a student in its institution.

248. The intuitive nature between a university and a student comes to play here: A student takes courses, studies for them, passes the necessary tests, and, thus, earns, as a result of what they provide to the educational institution, a course credit. And the addition of these course credits, when enough, allows a student to graduate with a degree.

249. Without the student performing the duty of being a student, an educational institution becomes mooted: Without its student, it cannot function. So, it depends on them performing the task of being a student when it requests them to be students at its institution by its offers of admission.

250. The Plaintiff herein did so: She attended classes, did the required work, passed the classes because Stanford requested her to be a student in its institution and requested that it performs studying for it.

251. And as a result of that request, with which the Plaintiff complied, she was *paid* in terms of course credit.

252. Stanford 'vacated' the Plaintiff's earned credits from those two years of schooling.

253. As such, the Defendant Stanford is now not paying the Plaintiff for services of being a student the Plaintiff rendered to Defendant Stanford.

254. The Plaintiff is entitled to the recovery of what she has earned—*quantum meruit*—the restoration of two-years' of course credit she has earned by hard work and rendering

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

services to Stanford by way of being a student.[30]

### XIII. THIRTEENTH CLAIM TO RELIEF
BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Against Stanford)

255. Plaintiff incorporates all paragraphs, as though fully set forth herein.

256. There is an implied covenant of good faith and fair dealing in every contract.

257. Taking the incorporated allegations of the Complaint as a whole, the Defendants herein breached the written and implied-in-fact contracts by bad faith, fraud, and unfair dealing by breaching their duty under these contracts by way of, *inter alia*, retaliation against protected speech and petitioning activity.

### XIV. FOURTEENTH CLAIM TO RELIEF
INTENTIONAL AND TORTIOUS INTERFERENCE WITH EXISTING CONTRACT AND INDUCING BREACH OF CONTRACT THERETO
(Against Defendants Shaw, Devlin, Casebeer-Blum, Zumwahlt, ROES 1-10, SDPS, Smith, Barnes, Hernandez, Morgan-Herman, DOES 1-10)

258. Plaintiff incorporates all paragraphs, as though fully set forth herein.

---

[30] It is unclear to the Plaintiff why the Court dismissed this theory as "frivolous" in its screening order. Both historical use of the common law theory of *quantum meruit* in English (and Welsh) courts of equity and California common law recognize that "[r]esulting benefit is an open-ended standard[.]" *Maglica v. Maglica*, 66 Cal. App. 4th 442, 450, 78 Cal. Rptr. 2d 101, 105 (1998); *see also generally Pomona Valley Hosp. Med. Ctr. v. Kaiser Found. Health Plan, Inc*., 119 Cal. App. 5th 43 (2026) (*Pomona*). It is unclear to see why the services of being a student—one without which a university cannot exist and function—would not meet the threshold of that open-ended standard. It is also important to note that "[q]uantum meruit measures the value of services to the recipient[.]" *Pomona*, at p. 43. And the recipient herein—Stanford—determined the value of those services in terms of course credit, wherein one course is usually between 3 to 5 course credits. It is also unclear to the Plaintiff why 'value of services' here should be construed to be strictly monetary, especially given the fact that "[q]uantum meruit is an **equitable theory** which supplies, by implication and in furtherance of **equity**…" *Hedging Concepts, Inc. v. First Alliance Mortgage Co*., 41 Cal. App. 4th 1410, 1419 (1996) (emphases added). The Plaintiff is cognizant that *quantum meriut* is not often used in these contexts, but that perhaps makes this case as one that poses a question of first impression, not necessarily a frivolous one. The only case the Plaintiff was able to find where *quantum meruit* was used in an educational setting would support the Plaintiff's theory. "Plaintiff alleges that the University was unjustly enriched 'by retaining her tuition payment when it mishandled her grades and illegally dismissed her.' *David v. Neumann Univ*., 177 F. Supp. 3d 920, 927 (E.D. Pa. 2016). "But Plaintiff fails to allege how it would be unconscionable for the **University to retain the tuition paid for classes that she attended**." *Ibid*. (emphasis added). Indeed, as here, it would be unjust for the Plaintiff to not receive course credits **for courses that she has already attended and completed.**

42

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

259. All the defendants herein were aware of the written contracts between Stanford and the Plaintiff as the Plaintiff was a student living on campus, so it is implicit that such a contractual relationship existed between Stanford and the Plaintiff.

260. All the defendants herein were also aware of the implied-in-fact contracts between Stanford and the Plaintiff as the Plaintiff was a student, so it is implicit that such a contractual relationship existed between Stanford and the Plaintiff.

261. Taking the allegations of the complaint incorporated herein, all of the named defendants herein played an individual role in a concerted efforts for the Plaintiff's contracts with Stanford to be breached.

262. There is a clear damage to the Plaintiff because of this breach as she is unable to get a college education and all of the benefits driven therefrom.

### XV. FIFTEENTH CLAIM TO RELIEF
PROMISSORY ESTOPPEL
(Against Stanford)

263. Plaintiff incorporates all paragraphs, as though fully set forth herein.

264. Defendant Stanford made a clear and unambiguous promise to not revoke the Plaintiff's admission unless she provided false information on her application.

265. Defendant Stanford made a clear and unambiguous promise to provide the Plaintiff with a college education and an ultimate bachelor's degree.

266. Plaintiff relied on these promises.

267. The Plaintiff's reliance that she will not be expelled over the summer with 3-to-4 emails and with an abrupt not-even-properly-scanned, 5-page 'decision letter' or that the Plaintiff will not be expelled 3 years after applying to Stanford and two months after suing Stanford in federal court was both reasonable and foreseeable.

268. The Plaintiff was injured because of her reliance of that promise because she can no longer receive a college education and all the benefits that result therefrom.

### XVI. SIXTEENTH CLAIM TO RELIEF
FRAUD
(Against Defendants Shaw, Zumwahlt, and ROES 1-10)

269. Plaintiff incorporates all paragraphs, as though fully set forth herein.

270. Defendant Shaw's conduct, as alleged herein by way of incorporating ¶ 100-125,

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

constitutes fraudulent concealment, misrepresentation, and non-disclosure.

271. Defendant Shaw had a duty to disclose the operative record before him during disciplinary proceeding to be able to give the Plaintiff a sufficient ability to dispute the purported evidence relied on.

272. Based on his misrepresentations and fraudulent concealments, Defendant Shaw attempted to fraud the Plaintiff into signing a release form for him.

273. Defendant Shaw's could not have *not known* the falsity of his statements.

274. Defendant Shaw's persistence in attempting to get the Plaintiff to sign a release form 'for transcripts' while he already had the said transcripts clearly imply that he intended to induce reliance.,

275. The Plaintiff, during Defendant Shaw's purported and fraudulent investigation, had to rely on his fraudulent conduct, thereby being preventing from being able to defend herself appropriately and fully.

276. The resulting damages was the Plaintiff's expulsion from college because of Defendant Shaw's fraud.

277. Based on the allegations set forth herein by way of incorporating ¶ 95-99 and ¶ 215-224, Defendants Zumwahlt, ROES 1-10, Shaw also misrepresented the fact that their obtainment of the Plaintiff's protected student-record information was "for purposes related to the student's enrollment and transfer[]" 34 CFR § 99.31(a)(2) when it was not.

278. As set incorporated by reference herein, it is clear that Defendants Shaw, Zumwahlt, and ROES 1-10 were aware that the Plaintiff was not a transfer student or was not *intending* to enroll at Stanford, as she was already enrolled.

279. Based on the allegations set forth herein by way of incorporating ¶ 167-170, Defendant Shaw once again placed fraud upon the Plaintiff by fraudulent concealment and nondisclosure.

280. Defendant Shaw had a duty, under the applicable statute at 34 CFR Part 99, to release student-record information he obtained and stored in his office.

281. It is undeniable that Defendant Shaw was aware of *his own* communication and the records created therefrom and thereto.

282. It is also clear that Defendant Shaw attempted to defraud the Plaintiff because the

44

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

absence of such release delayed the Plaintiff being able to seek timely judicial relief of his absurd and vigilante-esque 'investigation'.

283.Plaintiff's reliance that there was "no such records" in his office was justifiable.

284.The resulting damages was the Plaintiff not being adequately able to vindicate Defendant Shaw's deprivation of her rights during his purported 'investigation' because she never knew what the Defendant Shaw relied on during his purported 'investigation.'

**XVII.SEVENTEENTH CLAIM TO RELIEF**
NEGLIGENCE
(Against Defendants Shaw, Devlin, Casebeer-Blum, and Jacobs)

285.Plaintiff incorporates all paragraphs, as though fully set forth herein, especially ¶ 123-129.

286.It is not necessary here to establish whether there existed a duty of care because the Defendant Shaw's statement at ¶ 105, and defendant Jacobs' communication with the Plaintiff thereafter, constituted negligent undertaking, even if assuming, *arguendo*, no duty of care existed.

287.The defendants breached this duty of care by only 'providing' mental health resources that would not be available to the Plaintiff if she was not located inside California.

288.Because of the defendants' breach of what they negligently undertook, the Plaintiff committed suicide.

289.Committing suicide is *per se* damage.

**XVIII.EIGHTEENTH CLAIM TO RELIEF**
NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against all Defendants)

290.Plaintiff incorporates **all paragraphs**, as though fully set forth herein but especially ¶ 123-129.

291.Taken cumulatively, the defendants' cumulative conduct was so extreme and outrageous; it was taken either with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

292. The plaintiff's suffering severe and extreme emotional distress are clear from the well-plead facts.

293.The well-plead facts show the clearest actual and proximate causation of the emotional

45

PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT

distress by the defendants' outrageous conduct.

### XIX.NINETEENTH CLAIM TO RELIEF
*RESPONDEAT SUPERIOR* ON COMMON LAW CLAIMS
(Against Defendants Zumwahlt, Wilson, Shaw)

294. Plaintiff incorporates all paragraphs, as though fully set forth herein.

295.This cause of action arises from all of the common law claims plead *supra*.

296.For any conduct of SDPS officers and administrative staff, Defendant Wilson is vicariously liable under the theory of *respondeat superior*.

297.For any conduct of ROES 1-10, Defendant Zumwahlt is vicariously liable under the theory of *respondeat superior*.

298.For any conduct of Defendants Devlin and Casebeer-Blum, Defendant Shaw is vicariously liable under the theory of *respondeat superior*.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

46

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

Here [in this interview] David [Reimer] makes a distinction between **the "I" that he is, the person that he is, and the value that is conferred upon his personhood by virtue of what is or is not between his legs.** He was wagering that he will be loved for something other than this or, at least, that his penis will not be the reason he is loved. **He was holding out, implicitly, for something called "depth" over and against the "shallowness" of [others like, *inter alios*/*as*, Defendants Smith and Shaw].** And so although David asked for and received his new status as male, has asked for and received his new phallus, he is also something other than what he now has, and though he has undergone this transformation, **he refuses to be reduced to the body part that he has acquired. "If that's all they think of me,"** he begins his sentence, offering **a knowing and critical rejoinder to the work of the norm**.

**There is something of me that <u>exceeds this part</u>, though I want this part, though it is part of me. He does not want his <u>"worth justified"</u> by what he has between his legs, and what this means is that he has another sense of how the worth of the person might be justified.** So we might say that he is living his desire, acquiring the anatomy that he wants in order to live his desire, but that his desire is complex, **and his worth is complex**. And this is why, no doubt, in response to many of the questions that [the (in)famous sexologist and psychologist John] Money posed: **Do you want to have a penis? Do you want to marry a girl?** David often refused to answer the question, **<u>refused to stay in the room</u> where [people like] Money [were]**, refused to visit [Johns Hopkins' Gender Clinic in] Baltimore at all after a while.

[…]

As this book was going to press in June of 2004, I was saddened to learn that David Reimer took his life at the age of 38. It is difficult to know what, in the end, made his life **unlivable** or why this life was one he felt was time to end. It seems clear, however, that there was always a question posed for him, and by him, **whether life in his gender would be survivable**. The norms governing what it is to be a **worthy**, recognizable, and sustainable human life clearly did not support his life in any continuous or solid way. Life for him was always **a wager and a risk**, a courageous and fragile accomplishment.

JUDITH BUTLER, ***Doing Justice to Someone***: *Sex Reassignment and Allegories of Transsexuality*, UNDOING GENDER, at pp. 71-2 and at p. 74 (Routledge, 2004 ed.). (emphases added) (annotation added in the brackets for clarity and context).

Respectfully submitted,

DATED: May 10, 2026.

/s/ Jane Doe
_____
JANE DOE

In Propria Persona

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff prays for follows:

1. For declaratory relief holding that the Defendants' conduct alleged herein violated the United States and California constitutions, California civil code, common law;
2. For injunctive relief, enjoining the Defendants from continuing to violate the Plaintiff's rights secured in United States and California constitutions, California civil code, common law;
3. For compensatory damages, including general and special damages, according to proof, but in no case less than $75, 001;
4. For punitive damages pursuant to 42 U.S.C. § 1983 and California Civil Code §§ 3294 and 52.1 (b), and any other applicable laws or statutes, in an amount sufficient to deter and make an example, but in no case less than $75, 001;
5. For statutory damages, according to proof, but in no case less than $75, 001;
6. For prejudgment interest according to proof;
7. For reasonable attorney fees, should the Plaintiff later retain an attorney;
8. For costs of suit; and
9. For such further relief which this Court deems is just and proper.

Respectfully submitted,

DATED: May 10, 2026.

*/s/ Jane Doe*
_____
JANE DOE

In Propria Persona

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF

**PUBLIC COPY OF CONDITIONALLY SEALED COMPLAINT**

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury in all of these causes of action to the fullest extent permitted by applicable law.

Respectfully submitted,

DATED: May 10, 2026.

/s/ Jane Doe

JANE DOE

In Propria Persona

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

5:26-cv-03809-BLF